In re Guardianship of Warner: Warner, Appellant, vs. Welton, Guardian, Respondent.

*September 13—October 10, 1939.*

For the appellant there was a brief by *Hill, Miller & Hill* of Baraboo, and oral argument by *James H. Hill, Sr.*

For the respondent there was a brief by *Brindley & Brewer* of Richland Center, and oral argument by *E. E. Brindley.*

FRITZ, J.   In the record returned on this appeal there is a transcript of the testimony submitted at the time of the hearing on the first petition, which resulted in the court's appointing a guardian of the person and estate of Joseph Warner on August 18, 1936; and also a transcript of the proof submitted on the hearing on the second petition which resulted in the judgment which denied Warner's application for the termination of the guardianship, and which is under review on this appeal.   There is no material conflict in the evidence

submitted at those hearings, and a review thereof discloses that the facts established by a clear preponderance of the evidence admit of neither the court's conclusions at the first hearing that Warner is incapable of taking care of himself and is mentally incompetent to have the charge and management of his property by reason of extreme old age, and that he has property which requires the protecting care and management of a proper person for its conservation, nor its conclusion at the second hearing that the guardianship should be continued. No proper or sufficient findings of fact were made after either hearing.

The following facts are clearly established, however, without any reasonable basis in the evidence for finding otherwise, and, in connection with them, there is testimony to the following effect by physicians who did not differ materially in their conclusions. Warner, who is now eighty-two years of age, was seventy-nine years old when the guardian was first appointed on August 18, 1936. His wife had died many years ago, but he had three daughters and a son Jay, all of whom were married and in middle life. For eighteen years he had lived on his sixty-acre farm, which was close to a farm which he had sold when land values were high to his son Jay. It was then subject to a $14,000 mortgage, and the father took a second mortgage of about $5,000. For about twelve years he had had a crippled hand, and the sixty-acre farm was operated by Jay, who paid rent therefor to his father. The latter employed a housekeeper. In addition to the sixty-acre farm, which was inventoried at $2,775, the guardian's inventory disclosed personal property, including household furniture, valued at $1,096. After the father suffered a stroke some years ago, he had Jay assist him in the management of his affairs, which was apparently done to his complete satisfaction. In 1934 he and Jay went to the clerk of the court and had an accounting at which they concluded that the erection of a silo, etc., and the payment of

bills by Jay had substantially exhausted what he had owed his father on the second mortgage, and that for the release thereof, the father would accept Jay's note for $500 to provide for his burial expenses, and that Jay should continue to look after the father's few business affairs and operate the sixty-acre farm. Prior to the filing of the petition by Amy Hackl for the appointment of a guardian for Warner, a controversy arose between her and him in regard to a loan of $225, which he had made to her husband, who had refused to pay it after obtaining a discharge in bankruptcy; and there had also arisen a controversy in relation to a loan of $165 which Warner made to his daughter Mrs. Nee or her husband, and which neither would pay.

No physician appears to have testified at the first hearing. At the last hearing three physicians were called as witnesses by Warner and one was called in opposition. Dr. Dull testified that he examined Warner in November, 1937, and the Sunday before the hearing. He testified in relation to answers which were correctly made by Warner to questions put to him in respect to his past and present ownership of farms and the improvements thereon and his disposition thereof, including transactions with his son. He also testified that on questioning Warner as to his mental attitude in various respects he found him normal; and that as a man of eighty years Warner could not transact the volume of business of a man of sixty, but that with but the business matters of owning only sixty acres of land Warner was competent to manage his affairs and take care of himself. Dr. Coumbe, who had known Warner for twelve to fifteen years, and who examined him particularly in relation to his past history, testified that he did not discover a condition of mental incompetency in Warner's reply to any question; that Warner had the average mentality for his age of eighty years and was competent; and that he was a little slow in his speech and disturbed in speaking, but there was no sign of mental decay and nothing in his condition that would cause any rapid

change in his mental condition. Dr. Benson testified that his conclusion as to Warner's competency, after talking to him several times about himself and his situation, and, in November, about his property holdings, his experiences of living on a farm and his health in general, was that he was a pretty astute old gentleman, and clearheaded and competent to transact ordinary business transactions; and that on hearing Warner cross-examined by counsel putting questions covering a period of time, he saw no evidence of senility. Dr. Campbell, who was called in opposition to Warner's witnesses, testified that he had known him for eighteen years, and in 1933 treated him when he had a cerebral convulsion which somewhat affected his speech and one hand; that at the time of that illness his mental powers were affected and he was mentally unbalanced, but he has never seen him, outside of that year, when he would say he was mentally unbalanced; that he saw him a number of times last spring, and up to that time his mental condition, which was due to arteriosclerosis, was fair; that he has not seen him since and could not say whether he had recovered, but did not think that he had; that he never talked with him about his property, but from 1933 up to the last time he saw him last spring, he would say that Warner probably was as mentally competent to have the charge and management of his property as the average old man; and that the last few times he talked with Warner he was pretty upset about his home conditions, and did not like the people he was living with, and the main thing he talked about was to get out from under the guardianship. The witness stated that it was his impression that Warner should be under guardianship "as all old men should be under guardianship;" but on cross-examination the witness testified that "for a man eighty years old he [Warner] is as good as the average."

There was conflict in the testimony of laymen on the subjects testified to by the physicians. In addition it was proven that the guardian, upon his appointment, rented Warner's

farm to William E. Manley and his wife, who were to have the use and rental value thereof in consideration of giving Warner lodging and food, doing his washing and mending, and keeping him in comfort in every way. Quarrels and dissatisfaction soon developed between Warner and the Manleys because of differences in their religious convictions and practices, and the Manleys' vegetarian diet, because of which they refused to provide meat for Warner. They also refused to allow him to have any heat in his room, and accused him of having taken some seed and would not permit him to be in and about the farm buildings. Because of the controversies which were not adjusted by the guardian, Warner in June or July, 1937, went to the farm home of his daughter, Una Peeples, and her husband, and upon Warner's refusal to return to the Manleys, the guardian arranged that they pay $12 a month for the balance of their rental period. The guardian offered that amount to Mr. and Mrs. Peeples for the keep of Warner. They refused and replied that they did not have much, but that Warner was welcome to what they had, and they continued to care for him without any intervention by the guardian. In November, 1937, Warner, after having himself examined by three physicians who advised him that he was competent, had the Hon. LEVI H. BANCROFT, then judge-elect of the county court of Richland county, prepare a deed which Warner executed, to convey his sixty-acre farm to his daughter, Una Peeples, and her husband in consideration of their execution of a written agreement binding them to provide Warner "with a good and comfortable home, and supply him with food and clothing, and all the necessaries of life including medical care and attendance in all manner and means give and provide him with a home and the comforts of life, and do all other things necessary and proper for the comfort and happiness of said first party."

The facts thus established by the evidence, including Warner's sensible and effective acts and manner of finally

ending the intolerable conditions to which he was subjected in the household conducted by the Manleys on his farm, together with convincing conclusions of the physicians as to Warner's mental competency, certainly do not reasonably admit of any inference that he was insane, feeble-minded, or mentally incompetent to care for himself or his property. On the contrary, his conduct and the arrangements which he effected for bettering his living conditions and securing a more congenial home and the comforts of life for himself demonstrate that he possesses the faculties of mind and strength of will essential to render him mentally competent to care for himself and his property. As this court said,—

"Only with great hesitation should courts, by the appointment of a guardian, interfere with the discretion of elderly people, owing no legal duty of support to any one, in devoting the property accumulated by them to their comfort according to their own tastes." *In re Guardianship of Welch,* 108 Wis. 387, 390, 84 N. W. 550.

With that established policy in mind, there clearly was no occasion or legal basis under the evidence herein for the appointment of a guardian, under sec. 319.01 (3) (b), Stats., or otherwise; and on Warner's application he was entitled to the termination of the guardianship and the restoration of his property to him.

*By the Court.*—Judgment reversed, with directions to enter judgment declaring Joseph Warner mentally competent, and ordering the discharge of his guardian, and the restoration of his property to him.